[Crim. No. 613.  Second Appellate District, Division One.—February 18, 1919.]

## THE PEOPLE, Respondent, v. EMILE RICHAUD, Appellant.

CRIMINAL LAW—MURDER—VERDICT OF MANSLAUGHTER—EVIDENCE.—In this prosecution for murder, in which the defendant was convicted of manslaughter, it is held the jury would have been justified in finding the defendant guilty of murder in the first degree.

ID.—FLIGHT OF A THIRD PERSON—UNPREJUDICIAL EXCLUSION OF TESTIMONY.—The trial court did not prejudice the defendant by excluding a question to the district attorney as to whether he had issued a subpoena for a certain third person, the intention as admitted by the defendants' counsel being to show that the person in question had left the county after having been subpoenaed, there being other uncontradicted evidence in the case fully accounting for the absence of the person in question and the circumstances of his leaving.

ID.—CROSS-EXAMINATION—IMPEACHMENT OF WITNESS—PROPER FOUNDATION NOT LAID.—There was no error in curtailing the cross-examination of a witness as to her testimony on a former trial, first, because the proper foundation was not laid by calling her attention to any former testimony given by her, and, in the second place, her answer, which was favorable to the defendant, was made and not stricken out.

ID.—WITNESS FOR DEFENSE — PREJUDICE AND BIAS — UNPREJUDICIAL CROSS-EXAMINATION.—It was not prejudicial to allow the district attorney for the purpose of showing interest and bias on the part of a witness for the defense to show on cross-examination that the witness' husband was then in jail and being prosecuted by the district attorney on a charge of murder, and that the witness was in constant touch with her husband.

APPEAL from a judgment of the Superior Court of Kern County. J. W. Mahon, Judge. Affirmed.

The facts are stated in the opinion of the court.

E. J. Emmons and Rowen Irwin for Appellant.

U. S. Webb, Attorney-General, Joseph L. Lewinsohn, Deputy Attorney-General, and Jerry H. Powell, for Respondent.

JAMES, J.—Appeal from a judgment of imprisonment after conviction of the crime of manslaughter.

Defendant was charged by the information of the district attorney with the crime of murder, alleged to have been committed on or about the twenty-ninth day of April, 1917, in the city of Bakersfield. The jury determined by its verdict that the defendant was guilty of the lesser crime of manslaughter. The points made by appellant are, that error was committed by the trial judge in sustaining objections of the prosecution to certain testimony offered by the defendant, and in admitting other testimony over the objection of the defendant. No point is made as to the sufficiency of the evidence to sustain the verdict, and indeed any such contention would be without the least validity. Under the testimony heard at the trial the jury would have been fully justified in finding the defendant guilty of murder in the first degree.

The person killed was Anna Gerardat, who at the time of her death was about twenty-eight years of age. She was employed as a waitress in a restaurant in the city of Bakersfield. Defendant was well acquainted with her; in fact, the reasonable inference to be drawn from the testimony is that the relations between the defendant and the woman had, prior to the day of the shooting, been of a very intimate nature. A man named Carter was also a friend of the woman. Admittedly the feeling between Carter and the defendant was not friendly. The shooting occurred on Sunday morning. On the evening previous both defendant and Carter had eaten their dinner at this restaurant and had been served by Anna Gerardat. Carter ate his meal quietly and left the place considerably in advance of the defendant, without any words being exchanged between the two. One of the waitresses employed in the place testified that defendant, near 9 o'clock of that evening, while in the restaurant, was seen to throw some money forcibly on the table in front of Anna Gerardat, and that she (the witness) went to him and asked him not to create a disturbance—"not to start anything there." The defendant replied and told this witness that she did not know what was behind it all; "that he had been putting up money and had been made a boob of long enough." At about 9 o'clock Anna Gerardat and the defendant left the restaurant together. Evidently they went together to the room of Anna

Gerardat in a hotel. The clerk of this hotel testified that shortly after 9 o'clock he heard loud talking in Anna Gerardat's room, and heard a man's voice say, "I am going to settle this. My God, I am going to settle this!" or words of that substance and effect; that he (the clerk) entered the room and ordered the defendant to leave; that the woman put on her wraps and the two went out of the hotel; that some time before 12 o'clock that night the woman returned and went to her room; that shortly afterward the defendant came in and was about to go to the same room, when he was stopped by the clerk; that after some talk between the defendant, the clerk and the proprietress of the hotel, defendant, upon the latter's order, left the place and was seen no more that night. On the following morning at about 7 o'clock, according to another witness' testimony, defendant appeared at a bar and there requested the return to him of a revolver which he had previously loaned to the witness. Defendant inquired of the witness as to whether the revolver was loaded and, receiving a negative response, asked for loaded cartridges and the witness gave him five loaded shells, which were of the proper caliber and of a number to completely fill the chambers of the revolver. Not long after this the defendant made his appearance at the restaurant where Anna Gerardat was employed. The woman had already arrived, and there was in the place another waitress named Howie, and the proprietor named Jan. Defendant took his seat at the table, facing toward the kitchen, and shortly afterward Carter came in and took a seat three or four tables distant from defendant and directly at his back. Anna Gerardat proceeded to wait upon the two men. Waitress Howie testified that she was in the kitchen and the proprietor was further toward the rear of the kitchen and Anna Garardat was toward the front part of the premises, at some place not known to the witness, when several shots were fired; that she (the witness) immediately pushed open the door leading from the kitchen into the rear of the dining-room, and there found Anna Gerardat lying face downward on the floor and the defendant standing five or six feet away; that defendant, upon observing the witness, said to her to look out, "You'll get yours." This witness testified that she retreated and ran around to a telephone to notify the police; that upon going back into the kitchen she saw Carter in one of the kitchen rooms, evidently

making his way to the rear of the building. Police officers arrived upon the scene very quickly, and the first officer testified that he informed the persons in the restaurant that no one should leave until he had found out who had done the shooting, and that defendant, who was there, replied: "You need not look any further; I am the one that done it." The second officer testified that similar response was made by the defendant to him and that defendant said he did not know why he had "done it"; that defendant was heard by this officer to make the further remark: "I wish I had got that other s—— b——." The revolver with which the shooting was done was pointed out by the defendant at the time, he having placed it in the kitchen. Five bullets were found, all of the caliber fitting this revolver, one in the body of Anna Gerardat, one on the floor, and the others in different parts of the room. No one saw Carter have a revolver on that morning at the restaurant. Carter's deposition was read in evidence, and his testimony showed that Anna Gerardat was just coming through the swinging door from the kitchen when shots were fired, and that she fell immediately; that the defendant came from behind a piano that was placed in the center of the room between the main front and the rear dining-room, and that he (Carter) immediately fled, going through the side passageway and out of the rear of the building. The trial occurred in February, 1918. At this trial the defendant in his testimony claimed Carter had made threats against him and that on the morning in question Carter was the aggressor and attacked him before he (the defendant) fired any shots. He disclaimed any intention to kill Anna Gerardat. There was further testimony on behalf of the defense given by one witness of a letter delivered to this witness by Carter prior to the day of the tragedy and which Carter requested the witness to mail to his mother at a distant point. The witness testified that he had read the letter and had returned it to Carter at the latter's request the day afterward. He was allowed to testify to the contents of it, which, as he stated them, were generally to the effect that when the letter was received by the mother the writer would be dead, as "he couldn't live without Anna." This witness testified further that after the shooting Carter had suggested to him that he had better forget "that he had had that letter"; further, that on another occasion prior to the shooting, Carter had told the

witness that he was out of luck and, when asked what was the matter, said "he had lost his girl and lost his car." This witness further stated: "I asked him what was the matter and he said, a French s—— b—— had beat him out of them." Also, that at that prior time Carter wanted to borrow a gun, but did not secure one from the witness.

Appellant assigns as prejudicial error the ruling of the trial judge in sustaining an objection to testimony sought to be elicited from the district attorney, who was called by the defense as a witness. The district attorney was asked, referring to the time when the trial of the case was set, as to whether he had issued a subpoena for Harry Carter. This was objected to on behalf of the prosecution, and the following dialogue occurred: "The Court: I don't see what it is for; I cannot understand it. Mr. Irwin (for defendant): I want to show that Harry Carter ran away. Mr. Conway (for the prosecution): Just a moment. He ran away, where to, the army? Mr. Irwin: I don't care where he went. I want to show as an independent fact that Harry Carter left the county after he had been subpoenaed, without notifying the district attorney where he was going. I want to show flight on the part of Harry Carter." The court sustained the objection and struck out the testimony of the district attorney as given up to that point. We think that the ruling was without prejudice. The attorney-general has cited several authorities from another jurisdiction which hold that evidence of flight of another person is not admissible on behalf of a defendant accused of crime. However, even though we concede that it was competent for the defendant to show such flight of Carter, there was other evidence in the case (and, by the way, it was objected to by the defense), which showed that Carter was working in the vicinity of Bakersfield up to November, 1917, when he enlisted in the army. This testimony was not contradicted in any way, and it fully accounted for the whereabouts of Carter and the circumstances of his leaving.

The second error assigned is that the court improperly curtailed the cross-examination of the witness Howie (the waitress who was in the kitchen at the time of the shooting). After the witness had given her testimony in the main, the substance of which has been hereinbefore stated, the follow-

ing occurred: Question by defendant's attorney: "As I understand, you didn't see any of the shooting, or didn't see anybody do the shooting? A. No, but I saw the— Q. You didn't see— A. I saw one flash back of the electric piano. Q. This is the first time you have mentioned that? Mr. Conway: Object to that as incompetent, irrelevant, and immaterial; it doesn't appear she was ever asked the question before. Mr. Irwin: She wasn't asked the question now. The Court: Objection sustained. Q. Did you ever make any statement to that effect when you were on the former trial of this case? A. No, sir, you asked—" A further objection was interposed by the prosecution and sustained. In the first place, the defense did not lay the proper foundation for the question by calling the witness' particular attention to any former testimony given by her; and, in the second place, the answer of the witness, which was favorable to the defendant, was made and not stricken out.

A Mrs. Mathews was called as a witness for the defense and gave testimony concerning alleged conversations had with the waitress Howie subsequent to the day of the shooting. The testimony of this witness was to the effect that waitress Howie stated to her that she had not seen any of the shooting, as she was in the rear part of the kitchen at the time. For the purpose of showing the interest and bias of this witness, the district attorney was allowed to show on cross-examination that the witness' husband was then in jail and being prosecuted by the district attorney on a charge of murder; that the witness was in constant touch with her husband. While it may be the subject of question as to whether this testimony was competent, yet it was not such as to impute disgrace to the witness personally, and therefore did not fall within those cases where judgments have been reversed because of incompetent questions asked a witness which would have a direct tendency to degrade. It cannot be said that it is probable that the jury rejected the testimony of the witness Mrs. Mathews upon the ground that she had a husband who was in jail untried on a criminal charge at the time of the giving of the testimony. In other words, the prejudicial effect of the ruling of the court does not appear.

We have now answered all of the contentions urged by the appellant as ground for reversal. We are satisfied that ap-

pellant has had a fair trial, and, moreover, was dealt with most leniently by the jury.

The judgment is affirmed.

Conrey, P. J., and Shaw, J., concurred.